## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MAILLE RUSSEL BONSALL** | : |
| | : |
| **408 Highland Avenue** | : |
| **Morton , PA 19070** | : **CIVIL ACTION** |
| **Plaintiff** | : |
| | : **NO.** |
| | : |
| **v.** | : |
| | : **COMPLAINT** |
| **THE COUNTY OF DELAWARE,** | : |
| **PENNSYLVANIA** | : |
| | : |
| **DELAWARE COUNTY COUNCIL** | : |
| | : |
| **COUNTY COUNCIL MEMBERS:** | : |
| **DR. MONICA TAYLOR,** | : |
| **MS ELAINE PAUL SCHAEFER,** | : |
| **MR. KEVIN M. MADDEN,** | : |
| **MS. CHRISTINE A. REUTHER,** | : |
| **MR. RICHARD R. WOMACK,** | : |
| | : |
| **MR. JONATHAN LICHTENSTEIN** | : |
| **MS. CHRISTINE KECK** | : |
| **MS. BARBARA O'MALLEY** | : |
| **MR. EDWARD BEEBE** | : |
| **MS. REGINA RODIA** | : |
| **MR. ANTHONY MIGNOGNA** | : |
| **MS. SAMANTHA COX** | : |
| **MS. DANIELLE KOERNER** | : |
| | : |
| **JOHN AND JANE DOES #1-10** | : **JURY TRIAL DEMANDED** |
| **201 West Front Street** | : |
| **Media, PA 19063** | : |
| **Defendants** | : |
| | : |

## CIVIL ACTION COMPLAINT

MAILLE RUSSEL BONSALL ("Plaintiff ), an adult female, by her undersigned

counsel, brings this action against THE COUNTY OF DELAWARE ("County") and the above

1

referenced entities and individuals in both their individual and official capacities, alleging as follows:

## INTRODUCTION

1.   Plaintiff, is a current  employee in Delaware  County's Department of Emergency Services ("DES") having worked there from 2009 through to the present, who brings this action against  the County, which together with those named in the case caption hereinabove, have acted and continue to act, both affirmatively and negligently, in discriminating  against Plaintiff on account of her sex and have maintained a hostile and illegal working environment, contrary to law and stated  County policy, such that DES Director Timothy Boyce ("Boyce") was able to sexually assault and otherwise harass Plaintiff. In addition, Plaintiff asserts various state law claims against the other named defendants.

2.   Plaintiff brings this action pursuant to federal law; namely for violation of her U.S. Constitutional Rights pursuant to the Civil Rights Act of 1866, 42. U.S.C. Section 1983 and for violation of her Civil Rights pursuant to Title VII of the Civil Rights Act of  1964 ("Title VII") 42 U.S.C. § 2000e *et seq*.  Relief is also sought pursuant to  the Pennsylvania Human Relations Act, 43 P.S. § 951 *et  seq.* and state law, where Plaintiff seeks compensatory and punitive damages (where applicable)  from Defendants.

## PARTIES

3.   **MAILLE RUSSEL BONSALL**  is 39-year-old female citizen of Pennsylvania,  who resides in Morton, within Delaware County, Pennsylvania. She has been and remains an "employee" of the County as defined in the above-referenced federal and state statutes  and enjoys protected status thereunder, when it comes to her sex .

4. Defendant, THE COUNTY OF DELAWARE is a Pennsylvania municipal corporation with home rule powers. It is located in Media, Pennsylvania. It is an "employer" as defined in the above-referenced federal and statutes.

5. Other Defendants include the County's governing body, an entity known as County Council, together with its individual members consisting of Dr. Monica Taylor, Ms. Elaine Paul Schaefer, Mr. Kevin M. Madden, Ms. Christine A. Reuther, and Mr. Richard R. Womack. Other Defendants include Mr. Jonathan Lichtenstein, Esquire, former Deputy County Solicitor and now County Solicitor; Ms. Barbara O'Malley, County Executive Director; Ms. Christine Keck, County Chief Human Resources Office/ Personnel Officer; Mr. Edward Beebe, former DES Deputy Director, promoted to Acting Director; Ms. Regina Rodia, DES Office Manager; Ms. Samantha Cox, DES Deputy Director of Training; Mr. Anthony Mignogna, former Communications Director promoted to Deputy Director; and Ms. Danielle Koerner, Chief of Special Operations. This is in addition to other John and Jane Doe defendants who include previous Council persons, persons responsible for personnel matters, and other supervisory employees who will be identified during the course of discovery.

6. All of these supervisory individuals named hereinabove have facilitated and protected Boyce when it came to his well- known and inappropriate sexual behavior in two ways. First, as supervisory personnel, they either knew of or had reason to know of instances of DES Director Timothy Boyce's sexual misbehavior. Secondly, the positions of all of those named came with an affirmative obligation to inquire and investigate what was taking place in DES. Instead of warning Plaintiff about Boyce's known behavior, those named enabled Boyce, in his own words, to "hide in plain sight" for many years. It was that crass sexual misbehavior, which Plaintiff has experienced since her being moved to the position of Boyce's Executive Assistant in March of 2019. Plaintiff was too intimidated by this authority and from her fear of losing her job if she

3

dared report about his predatory behavior. The workplace has been abuzz with talk of his misbehavior. Moreover supervisory personnel were well aware of the history of his depraved behavior, going back perhaps to a time prior to his County employment, and did nothing. Notwithstanding that she was terrified of losing her job if she reported what was he was subjecting her to, supervisory personnel knew of his behavior beforehand and did nothing. Others named should have known of his misbehavior.  As a result, until his recent removal, Plaintiff has had to endure Boyce's improper advancements and an illegal working environment. If these Defendants had exercised their affirmative  obligations, Plaintiff's harm would have been thwarted and/or would not have taken place at all.  At all times relevant hereto, all individual Defendants were acting in their individual and official capacities and under color of the law of the Commonwealth of Pennsylvania.

## JURISDICTION & VENUE

7.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this is a civil action arising under federal law.

8.  Plaintiff  also invokes the supplemental jurisdiction of this Court over her related claims arising under state law  pursuant to 28 U.S.C. §1367(a), all of which are so related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.  Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) and (c), since both Plaintiff and Defendant reside and do business in the Eastern District of Pennsylvania, and since the events giving rise to Plaintiff's claim occurred in the Eastern District of Pennsylvania.

## FULLFILLMENT OF CONDITIONS PRECEDENT

10. Plaintiff has fulfilled all conditions precedent to the institution of this action under federal and state law.  Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRA") on or about May 15, 2024. The EEOC assigned her charge # 530-2024-06171. The Charge as filed claims sex discrimination on a continuing basis commencing in 2019 and continuing to the present time.  Specifically, as set forth herein, Plaintiff  has been discriminated against and adversely impacted  as a female person who has been forced to work in an illegal sexist environment, as created by Boyce, all of which has been allowed to continue by the other named Defendants.

11. Plaintiff made a  request to the EEOC on October 8, 2024 for a Right To Sue Letter. On that date, the EEOC closed its investigation.  As per pertinent practice involving governmental entities as respondents/defendants the Right to Sue Request was forwarded to the U.S. Department of Justice ("DOJ") for the  purpose of issuing the requisite Right to Sue Letter. That Right to Sue Letter from DOJ was issued dated October 29, 2024, with receipt acknowledged by Plaintiff's counsel on October 30, 2024.

12. This lawsuit has been timely filed as it has been brought within ninety (90) days of receipt of the issuance of the Right to Sue letter.

## FACTS

13.  In her early twenties, after graduating from high school and completing a one year program at cosmetology school, beginning in 2009, Plaintiff  was happily employed as a dispatcher in Delaware County, Pennsylvania's Department of Emergency Services. ("DES") . This lasted for ten years until she became Director Boyce's Executive Assistant.

5

14. In March of 2019, when Plaintiff's child rearing responsibilities for her four children necessitated a predictable work day schedule Plaintiff moved to a front office position as Executive Assistant to DES Director Tim Boyce. Despite taking a $15,000 pay cut, Plaintiff took the position to meet those family needs. At the outset Boyce told her that he had to fight to get her the position, saying that he would try to get her a raise and promised that he would personally spot Plaintiff financially if there were any problems.

15. From that moment onward to the present, Boyce has terrorized Plaintiff and mentally isolated her, making her terrified to speak up and report his behavior, while, in her own words, he made her life a living hell, condemning her to taking her trauma to her grave.

### A Chronology of Abuse

16. From her first day in March, 2019, working directly for Boyce, and even now, past the point of his being placed on administrative leave and removed from his office on April 26, 2024, Boyce has deliberately, repeatedly, and continuously subjected Plaintiff to unwanted verbal, physical and sexual harassment, during and after work hours. Given Boyce's political power, Plaintiff feared that her situation would only get worse were she to report him. Moreover, she knew of the unfair and negative experiences that others had in the DES who did report mistreatment. Accordingly, Plaintiff did not report Boyce during his employment . With the needs of her family uppermost in mind and her dependency on her job, Plaintiff endured his abuse, only to be retaliated against by the named defendants following Boyce's tenure.

17. As far back as the start of her work as his Executive Assistant in March, 2019, Plaintiff recalls being subjected to Boyce's off-color and offensive jokes, as well as his questions about her personal sex life. On her first day in the position, he specifically told Plaintiff that the office had one rule; that spouses or "roommates" , as he insisted that

6

employees refer to them, were not allowed to come to their workplace. His talking and gossiping

were relentless, prompting Plaintiff to question him as to why, as a boss, he said such things

and gossiped so much. She further told him that this was all inappropriate.

18.  Immediately upon becoming his Executive Assistant, Boyce isolated Plaintiff

by instilling in her a fear of his power and connections. Amongst other things, he told her that

she was no longer a union employee and could be let go for anything at any time, for no reason

whatsoever. He bragged about having Council members Madden and Zideck "in his pocket."

Moreover, upon information and belief another DES  employee has given recent deposition

testimony that Boyce claimed to have Council member Monica Taylor likewise "in his pocket."

When Council members were elected Boyce told Plaintiff that everyone's job at DES was at risk,

but that she would be fine as long as she did whatever Boyce told her to do.

19. Notwithstanding her protests, Plaintiff recalls one incident in September, 2019 , where

with his hands shaking, he thrust his phone in her face. On the screen were graphic pictures of

his private parts. Plaintiff immediately left . When she returned,  Boyce apologized and Plaintiff

said "let's move on."

20. In mid-September, 2019, Boyce persisted with his  inappropriate sexual questions to

her such as " How often do you and your husband have sex ?" Plaintiff responded that she was

happy with her husband and preferred not to share that kind of information.  Boyce volunteered

that he had not had sex in years and that he and his wife slept in separate rooms.  At this point

Plaintiff wondered how much weirder things could get. She considered the information he was

volunteering to be inappropriate and none of her business.  Indeed things got much weirder and

much worse.

21. Also in September, Boyce asked Plaintiff to go on picnic with him.  He was

persistent and did not want to take "no" for an answer. Nevertheless, Plaintiff refused.

22. In Mid- September, 2019, at approximately the same date when Boyce showed her his naked pictures, Boyce insisted that Plaintiff accompany him to a meeting at the Media Courthouse, justifying this demand by telling her that if she ever wanted a raise or promotion, she would have to been seen with him everywhere. However, instead of taking her to the Courthouse, he drove her to a wooded area, saying that he needed to take a walk. All the while he was talking incessantly, repeating "I'm your friend." Scared and baffled as to why they were there, Plaintiff initially did not get out of the car. However, Boyce walked around to her side of the car and opened her door, persisting in his efforts to get her out of the car by saying that it was a beautiful day and that he simply wanted her to take a walk with him. When she got out, Boyce went into the trunk and pulled out a blanket. Plaintiff said that she felt uncomfortable and wanted to leave. With Plaintiff still standing next to the car on the passenger side, Boyce pulled Plaintiff in to him , grabbed her head and tried to kiss her. Shocked, Plaintiff resisted, by pulling away and walking away. Nonetheless, Boyce kept it up, pleading "Please one kiss!" Plaintiff refused. Boyce then asked Plaintiff to hug him as he physically blocked Plaintiff from getting back into the car so that he was able to forcibly hug her, grabbing her chest and breasts. In fear for herself and not wanting things to get even worse, Plaintiff said "I'll hug you, but I want to go back. I am happy with my husband." Relieved after Boyce returned her to her office, Plaintiff mistakenly thought that this would be her last assault from Boyce. However, this proved to be far from the case.

23. After Boyce invited Plaintiff to a conference and assured her that other DES employees would be attending that conference in New York City scheduled for September 24, 2019, Plaintiff agreed to attend. Boyce insisted that he would pick her up at Rose Tree Park and

drive to the conference. When he arrived at the park, Plaintiff was surprised to see that no one

else was in the car. Upon arriving in New York City, Boyce parked the car in a garage and

asked Plaintiff for a kiss. Plaintiff refused, but he proceeded to force her into a kiss anyway. He

then led her into New York City's Bryant Park where they took a walk and he suggested that

they eat before the conference. Boyce told Plaintiff that he was miserable with his wife, but said

that he would never leave his wife for Plaintiff. Not understanding why he was telling her this,

Plaintiff asked him why he was telling her these things. Boyce appeared to Plaintiff to be in a

state of some alternate reality. Boyce and the Plaintiff stayed in the park for the rest of day and

never attended the conference, if in fact there even was one. Yet, repeatedly throughout the day,

Plaintiff continually brought up the conference, saying that they should attend. Instead, Boyce

tried to put his arms around her from behind, suggesting that he could get them a room. Plaintiff

refused. He then offered to go shopping with her and buy her shoes. She refused. Eventually, it

was early or mid/afternoon and Plaintiff told Boyce that she wanted to go home. Boyce agreed,

concerned about traffic.

24. On the drive back from New York City, Boyce kept insisting that "You truly

understand me." At a rest stop, both went inside and Plaintiff used the restroom. When they

returned to the car, Boyce physically pressed himself up against Plaintiff and asked her to get

into the back seat. She refused. He persisted, imploring "just for a minute. I want to talk "

Despite her refusal, with a body block, he pushed Plaintiff through the back door into the back

seat. Notwithstanding the fact that others were present in the parking lot, Boyce placed his face

on Plaintiff, grabbed her breasts, and put his hand down into her pants. Plaintiff resisted and

insisted upon returning to the front seat. She then did so. On the ride back there was more

delusional talk from Boyce about their being "best friends."

9

25. From the inception of Plaintiff's directly working with Boyce, he had a habit of always putting money in her purse without her knowledge or permission. Upon Plaintiff's discovery and objections, he would be dismissive, saying "Use it for the kids", " Take the kids for ice cream, my treat." or " Get a pizza for the kids on me because you work so hard and you're a good mom." Repeatedly, Plaintiff would return the money only for it to reappear. Although he offered to pay for other things, including concerts, clothing , shoes, and especially dresses, Boyce was obsessed with asking about her clothes, where they were from and what stores she liked.

26. Boyce was so obsessed with Plaintiff and delusional that he would take credit for buying her things that he had nothing to do with. For example, Plaintiff's husband bought her a Canada Goose down jacket for her birthday. Boyce would enter her office and sniff it, say how sexy it was, and then claim that he had bought it for her. Here, Plaintiff corrected him, telling him that her husband got it for her. Boyce feigned surprise, responding "Oh really, are you sure?" This delusion of his continued through the entire duration of his County employment. Another example of Boyce's obsession with Plaintiff was his insistence that he wanted to buy her daughter something from the Penn State gift shop. Despite rejecting this several times, Boyce bought something anyway.

27. In early January, 2020, Boyce and DES employees were busy with a radio project. Plaintiff then hoped that these responsibilities would divert his attention and that his abuse would come to an end. Nonetheless, approximately every day he made flirtatious comments to her, complimenting Plaintiff on her looks. Plaintiff could not understand why others pretended not to see what was going in plain sight. All the while, Boyce badgered Plaintiff, telling her that no one liked her, but not to worry because he would take care of her.

28. In mid-March, 2020 with the rise of COVID and right before St Patrick's day, Plaintiff had hoped that the physical and mental harassment would cease as Boyce's office was being relocated to the Courthouse, away from DES offices. Despite the fact that many employees were being told to work from home, Boyce insisted that Plaintiff move to the Courthouse and work with him, telling her that she had to work there with him, explaining that Plaintiff would never otherwise get a raise. Further, he told her that if she worked from home it would "look bad" to Council. The essence of his instructions to her were "Trust me at everything I say and do, or you won't get a raise."

29. A constant component of "Working" with Boyce in the Courthouse was his touching and grabbing her more than once a week. In addition, at the end of virtually every day, Boyce called Plaintiff after work, when Plaintiff simply wanted to go to the safety of her home. To Boyce, neither her home, nor anything else, were off limits. All the while Boyce was still declaring that he and Plaintiff were in a relationship.

30. It was inconceivable to Plaintiff that officials in the Courthouse and supervisory staff at DES did not know and see how strange and controlling Boyce was with Plaintiff. Early in Plaintiff's tenure as his Executive Assistant, he told her that union representative Walt Kempczynski sent emails to Council about Boyce, apparently to no avail. To further control her, Boyce had isolated Plaintiff and reduced her to a shell of herself, afraid that no one liked or would believe her. Given Boyce's powerful alliances, the fact that Boyce repeatedly bragged that he knew everyone at the County, including politicians and Judges, and his bragging that he had Council Members in his pocket, it was easy for Plaintiff to feel helpless. Moreover, Plaintiff was and remains fearful and intimidated, sometimes wrongly blaming herself, a common

reaction of rape victims and those who are sexually abused.  All along, Plaintiff just wanted to do her job, be available for her family, and be left alone.

31.  Plaintiff has been told by others that everyone in the Courthouse assumed that she and Boyce  were having an affair. Given that apparently widespread talk and Boyce's history, possibly going back prior to his hiring by the County,  one would think that Personnel/HR would have investigated him prior to his hiring and certainly after the widespread talk.   However Boyce was allowed to "hide in plain sight".

32.  In approximately January of 2020 Boyce began conducting monthly  Public Safety Advisory Committee meetings.  Attendees included Boyce, Beebe, Plaintiff, other DES employees, Councilmembers Elaine Schaeffer and Kevin Madden, representatives of the District Attorney's Office, including D.A. Stollsteimer, and Chief of Investigations James Nolan, together with several police and fire chiefs. Plaintiff  noticed that others would not so much as look her in the eye. Clearly, they must have been suspicious that something was amiss between Plaintiff and Boyce. Then around April, 2023, Boyce started holding Monday morning meetings: "Department Updates with the Director."  Boyce insisted that Plaintiff attend both meetings. Eventually, around September, 2023,  Plaintiff refused to continue attending these meetings because it was clear that the other participants regarded her presence as wholly unnecessary, did not like her, and  treated her badly, embarrassing Plaintiff.  Boyce claimed that he was building Plaintiff up, yet he would belittle her in those meetings, telling her to "grab him some coffee." To no surprise, others called her "his show pony" or "coffee girl". Despite these references and her obvious discomfort, not one attendee went to HR/Personnel.  To consummate his control Boyce continued to remind her that he was the only person who believed in her while  everyone else was out to undermine her.

12

33. In accordance with Boyce's promises, on approximately October 8, 2020 Council, without investigation,  rubber-stamped Plaintiff's promotion to Deputy 911 Coordinator, with a raise.  Plaintiff now had her own office, separate and apart from his, and thought he would finally leave her alone.  Nonetheless, his obsession with her continued, as he resorted to coming into her office all the time. Plaintiff tried to limit conversations to office-related work, but Boyce refused. Plaintiff remembers pleading with him, on the occasion of the death of her friend,  to please stop his advances and instead just be friends. His delusional repeated response was " We are in love. I'm here for you." He touted himself and  badmouthed Plaintiff's husband, saying such things as "I could get you a better ring….."   In an effort to dissuade Boyce, Plaintiff reminded him that, at the time,  he was 60  years of age, with grandchildren and daughters who were Plaintiff's age.  Boyce admitted that he should not behave as he did and that he should be more respectful. Further, he suggested that  people would think that Plaintiff had never attained anything on her own.  This image created and fostered by Boyce that Plaintiff is incapable of attaining anything on her own, is held by others to this day.

34. From early or mid-2021 until Boyce's departure, virtually every morning, Boyce approached Plaintiff  and tried to kiss her. With each new day, just to escape Boyce's constant pestering and preoccupation with her and to be left alone, Plaintiff resorted to going outside to smoke. Yet,  undeterred Boyce would repeatedly send Ed Beebe to physically find her and send her back to him.  Upon information and belief Beebe had no problem with being a "procurer" for Boyce and must have known what Plaintiff was being subjected to, all contrary to Beebe's responsibilities to report misconduct.

35. Sometime after Covid, in the fall of 2021, Plaintiff learned that DES employee Ms.

13

Landa Johnson was in the back room of the Medical Examiner's office doing recordkeeping when Boyce kissed her and put his hands in her pants. Like Plaintiff, she protested and pleaded with him not to do that. As was the case with Plaintiff, Boyce would call her, say inappropriate things, and ask her for pictures. Plaintiff also learned that, like her, Ms. Johnson would resort to telling Boyce whatever he wanted to hear in an effort to temporarily get rid of him. Ms. Johnson started the 911 call taker training program sometime in the early Spring of 2022. As was the case with Plaintiff, Boyce would show her nude pictures of himself, sometimes in front of a room full of people. As was the case with Plaintiff, training officers somehow blamed Ms. Johnson and gave her dirty looks. So as not to be subject to the harassment any longer, in the early summer of 2022, she left the County for work at a funeral home.

36. In May of 2022, Boyce texted Plaintiff offering to buy her a "sexy " dress. He told Plaintiff that she would be a "princess." He always used that description; i.e., that Plaintiff was his princess.

37. Sometime in April or May of 2023 a fellow employee, Bob Chester admitted to Plaintiff that he had stopped interacting with her because of the looks he would get from Boyce. Chester said that he felt that he was not allowed anywhere near the "boss' girl". Upon information and belief, virtually everyone in DES was well aware of Boyce's abnormal fixation with Plaintiff.

38. Often, Boyce would repeatedly tug at Plaintiff pants and shirt, asking to see her undergarments, saying he "just wanted to play" with her. There were times between 2023 and 2024 that he was so forceful that he would pull her over to him by her pants. He would ask to see her underwear, ask what her bra looked like and asked her to show him, saying it was no big deal, just fun. Plaintiff would walk away.

14

39. On one occasion, in July, 2023 he aggressively put his hand down her pants. She immediately pulled away and left out of his office's side door, which he had directed her never use, because it would look bad if people saw her. As a result, later that day, he told her that he would have to "punish his bad girl".

40. After these July, 2023 incidents, Boyce's obsessive  gift giving increased. Plaintiff returned  the gifts back into his office when he was out. Notwithstanding, he would return them back to Plaintiff or leave them in her office when she was out. Ultimately, Plaintiff would either donate them or throw them away.

41. On July 28, 2023, at approximately noon, with the exception of the 911 dispatchers, Boyce sent everyone in the Department home except for Plaintiff.  He told her that he would be leaving for a wedding. Then he brought a coffee cup filled with champagne into her office and handed it to her. He told Plaintiff to drink it, refusing to take "no" for an answer. All the while he referred to her as his "bad girl", repeating : "Do I have to punish you ?" To pacify him, she drank half of the coffee cup. From that point on, she remembered nothing, other than waking up on the office floor at approximately 4:00pm. Boyce was gone . Feeling groggy, sick, disoriented and weak, Plaintiff knew that she couldn't drive home, she went outside to get air. Very upset, scared and angry that Boyce would simply leave her in that condition, Plaintiff decided to call him. He answered her call with the comment,  "Hello, butt dial from Maille, you've reached Tim and Mary Theresa !" (his wife).  Plaintiff hung up, sat down and drank a lot of water until she recovered a bit and felt safe enough to drive home. In retrospect, given the small amount of champagne and her extreme reaction, Plaintiff suspects that Boyce had drugged her.

42. With the exception of dispatchers, Boyce sent everyone home early on

15

Fridays during the summer of 2023, so that he would be alone with Plaintiff.   He would pull Plaintiff into him and say "I love you so much", "You're my best friend".

43.  In  October or November of  2023, after Plaintiff's friend Jackie Kahler told her that she needed a better job that included benefits, Plaintiff recommended her to Boyce, who hired Ms. Kahler in early December, 2023.  Plaintiff did so convinced that since Boyce knew of their friendship, and since Plaintiff was the one being abused, that Boyce would not pursue Ms. Kahler.  This proved to be wrong.  Boyce subsequently promoted Kahler to his Executive Assistant and then sexually assaulted her in early 2024. She did not return to work thereafter. With Jackie Kahler's sudden departure, Boyce  acted stunned by Ms. Kahler's sudden departure acting as though he did not know why she was no longer coming in. However, Plaintiff learned what happened directly from Ms. Kahler weeks later. Plaintiff then felt responsible for pairing her best friend with a predator.

44. Up to the end of his tenure, mostly in 2023 and 2024, Boyce repeatedly insisted that it would cost Plaintiff  "a kiss" in order for him to process Plaintiff's work product. Plaintiff tried to turn aside or otherwise avoid him in these instances. Undeterred, he would leave post it notes on  Plaintiff's computer saying : " I love you" "I miss you." "You are beautiful. " "I love us."

45. All along, Plaintiff  could not understand Boyce's confidence in his ability when it came to exploiting and abusing her. She felt that every day was a lie, that it was unbearable for her to look at others, while, clearly, others refused to look at her and would otherwise avoid her altogether.

46. Plaintiff's husband became suspicious, particularly after Boyce made  insinuations to

16

him about her.  Plaintiff worried that her husband would feel that she had invited Boyce's

behavior.  Knowledge of Plaintiff's fear only fueled Boyce.

47.  In Plaintiff's position as the DES Deputy 911 Coordinator since October, 2020,

she works with grants, including doing reports thereon, and conducting spending reviews

regarding grant funds. The special SAP computer that Plaintiff needed to use in accordance with

those responsibilities was located in Boyce's office.  Plaintiff repeatedly asked Boyce for her

own SAP computer which he separately gave to others.  However, Boyce expressly refused this

for Plaintiff. Up until Boyce's being placed on leave in April of  2024, Plaintiff  had to manage

each day with the anxiety of what might happen to her while utilizing that computer. Although

she tried to avoid it, this often  would place her alone with him.  Again, up until his being placed

on leave, each thing that Plaintiff worked on would cost her a kiss, or hug, and spending time

alone with him.

48.  Despite  Plaintiff's efforts to avoid Boyce by using the SAP computer when he

was not  in his office, she was not always successful. If they were both there, he would shut the

door behind them, pretending he was on a phone call. On more than one occasion,  he would

take out his penis and masturbate. On several occasions he would touch his penis and say "it is

yours."   Although he tried to pull Plaintiff in to him and have her participate, Plaintiff refused to

touch him. Unprotected in even her own office, Boyce would sometimes enter Plaintiff's office,

shut the door, and remove his penis and masturbate either sitting in a chair across from Plaintiff's

desk or standing next her. Plaintiff would turn away, waive him away, and plead with him to

stop.

49.  Boyce told Plaintiff that  he "loved the control you have over me." Plaintiff's reply was

17

that he was the controlling party, not her. In fact, Defendants enabled and allowed Boyce to be the one controlling everything when it came to Plaintiff and other females involved with DES.

50.  In addition, Boyce shared with Plaintiff absolutely crazy things, like telling her that his wife had h.p.v. as a result of his interaction with a stripper. He told Plaintiff that his wife didn't like her as she thought Plaintiff and Boyce were having an affair. This was all a part of his deliberate scheme to dominate Plaintiff by physically and mentally isolating her from others.

51.  Boyce constantly came into Plaintiff's office and closed the door at which times Plaintiff would repeatedly ask him "How do you not want to work ?... Shouldn't we be apart ? ... I am busy". However, even when Plaintiff told him she was busy, he would leave and then come right back. If she stepped out, Boyce would leave notes in her office. If Plaintiff was in the restroom across from his office, she would come out and he would be standing at his office door waiting for her. If Plaintiff was not in her office when he arrived in the morning, he would go straight to her office and wait in the hallway outside of it until she would return.

52.  Boyce would create issues between Plaintiff and other co-workers, pitting them against her. He acted very differently towards the women who disliked him and talked about how he had to get rid of them. In turn, some women wanted to, and ultimately did move to another job, because they couldn't stand him.

53.  Early on, Plaintiff learned that various inappropriate activities by other males in DES did not result in any charges or change. Instead, the victimizers prevailed and, in some instances, even received promotions. Females who complained were encouraged to quit. The way these incidents were handled re-enforced Plaintiff's contention that no one would ever take

her seriously if she were to reported what had happened to her to HR. She was convinced that the end result of reporting would be the loss of her job.

54. Plaintiff had firsthand experience when it came to seeing how Boyce handled sexual complaints by female employees directed at other males. In April or May of 2021, Boyce asked Plaintiff to sit in with him and two union representatives during a call that was made to a female dispatcher who had accused two male dispatchers of sexually harassing her and sharing naked photos of her with a supervisor, where she was made fun of. This woman was, in turn, accused of being promiscuous and wanting to financially profit from the situation. Boyce specifically asked Plaintiff to be on the call "as a female witness" but not to say a word. Plaintiff could tell that the complainant was distraught and wanted the issue pursued. However, Plaintiff witnessed Boyce bulldoze the complainant the entire time, minimizing the situation and trying to convince her to quit. That complainant did quit with her last day of employment on May 6, 2021.

55. Plaintiff also learned of another 911 call taker who reported to Boyce that a police dispatcher had sexually assaulted her outside of work and that she was uncomfortable having to continue working with him. Boyce called the complainant's step-father, president of the DELCO FOP first to see how he wanted Boyce to handle the matter. Boyce ended up telling the complainant that there wasn't anything he could do about the situation. She also later quit.

56. Plaintiff became aware that Jackie Kahler retained counsel concerning her assault by Boyce who contacted the Delaware County District Attorney in early April, 2024 about what happened to her. Eventually, a criminal complaint was filed by the Attorney General against Boyce. Ms. Kahler's courage in exposing what happened to her motivated Plaintiff to come forward and tell the DA's and Attorney General's office representatives Plaintiff's own story.

19

57.  The very first day that Boyce did not come into Plaintiff's office was approximately April 17th or 18th.  He came to work for two days straight, crying all day, standing in his office and staring out the window.  When Boyce was asked what the matter was, he told others something about getting bad results from a doctor.  At another time as he was walking into the building,  when asked what was wrong, he reportedly said " I hate this f---ing place." After those two days, he returned to his old self,  perhaps feeling that his "hiding in plain sight" would succeed.  Nevertheless, his final day in the office was April 25, 2026.

58.   On the morning that he was suspended, April 26, 2024, Boyce texted Plaintiff and asked her about a good time to call. Driving to work, Plaintiff subsequently took his call.  He said that they just fired him and that he was told not to contact anyone.  Plaintiff then asked him why he had called her.  He said, that he "couldn't  believe Jackie did this to me." He asked  "Is she jealous of what we have?"  Boyce ended the conversation by saying " I know I can still trust you".  Plaintiff considers his comment to be a threat and she remains fearful of him and his advances which have continued through his first criminal preliminary hearing to which he subpoenaed her.

59.   During her entire experience with Boyce, Plaintiff felt that she had no choice but to tell him what he wanted to hear, all in failed attempts to keep Boyce at bay. Her goal was simply to survive and get through each day, finding new ways to keep him away from her.  She  became numb and disassociated from her circumstances in the vain hope of avoiding worse.

60.  Given what is set forth herein, the question arises as to why, before filing her Charge with the EEOC on approximately May 15, 2024, Plaintiff did not complain earlier about Boyce to supervisory personnel and HR:

First, Plaintiff felt that supervisory personnel, including but not limited to Edward Beebe, Council's chosen acting replacement for Boyce, were well aware of Boyce's inappropriate behavior towards Plaintiff and other women, even witnessing it, procuring Plaintiff for Boyce and choosing to ignore the predatory and dehumanizing situation.

Second, as stated hereinbefore, all along Plaintiff was convinced by Boyce that his connections to the powerful members of the County would render any complaints by her to be futile and not believable, even had she come forward.

Third, Plaintiff personally saw that victimizers prevailed when it came to instances where other women complained. Accordingly, she fully expected that her victimizer, aided by others, would prevail.

Fourth, and most fundamentally, is the fact that Plaintiff has needed her job and certainly had the right to work in a safe environment which the County has failed to provide.

61. In further support of what is set forth hereinbefore, Plaintiff contends that supervisory personnel in DES and, more broadly, the County, were well aware of what was taking place, given Boyces improper activities with her and other females. Moreover, Boyce openly paraded Plaintiff around DES and the County Courthouse in clearly a possessory fashion before others resulting in others' referring to her as "his girlfriend."

62. Boyce was constantly bragging about how close he was to County governing officials and that he alone would be responsible for her remaining in her job. He held himself out from the outset as Plaintiff's mentor and protector. He would insist that Plaintiff attend meetings with him and others where Plaintiff's presence was totally unnecessary, thus embarrassing her. At the same time, he would say "I've got your back".… "I'll make you Deputy Director"….. "I'll

21

get you a car." Instead Boyce completely wrecked Plaintiff emotionally, resulting in a mindset that necessitates the skills of a professional and a great deal of time to overcome .

63. Because of his prominence and political connections, Defendants protected Boyce in derogation of their affirmative responsibilities, allowing him, in his own words, to "hide in plain sight" a phrase capturing his own confident characterization of the improper activities that he could and did get away with.

64. In addition to the physical and sexual harassment experienced by Plaintiff, there has been a methodical, insidious and successful campaign by Boyce, to isolate and alienate Plaintiff from others, mentally placing Plaintiff and her future, totally under his control.

65. Plaintiff is now undergoing psychological treatment and now recognizes that she has experienced the textbook kind of guilt, rationalization and self-blame commonly experienced by women who have been sexually assaulted. This includes her mistaken belief that if Boyce was abusing her, that other women would be spared. She has now learned that this was not the case.

66. While Plaintiff has repeatedly been physically sexually accosted by Boyce, including instances where he exposed himself and masturbated in front of her, she never sexually submitted to him.

67. The treatment that Plaintiff experienced was merely one instance of the inequity between male and female employees that has prevailed in DES with respect to sex-based harassment and abuse. Upon investigation, information and belief, Boyce's misbehavior was not isolated when it came to Plaintiff, but extended to other women as well, who included female employees and prospective female candidates for employment.

68. Upon investigation, information and belief, as referenced hereinabove, when it came to allegations of inappropriate sex-based harassment by other males in DES, supervisory

22

personnel would turn the matter over to Boyce, who would simply cover up the matter, instead of referring it to appropriate County authorities, for fear that an investigation would eventuate as to Boyce's own activities. In some instances the perpetrator was promoted.

69.  Boyce's inappropriate practices were the cause of hearsay and gossip, not only amongst DES employees, but also County employees located in the County Courthouse. Notwithstanding, those elected officials responsible for running the County, along with other pertinent personnel, have allowed Boyce to maintain an illegal environment characterized by his persistent and flagrant sexual harassment of women in the most crude and base form.

70.  No one appears to have paid any attention to various DES 911 Facebook posts. Responding to a Feb 15, 2019 DES 911 Facebook post where  Stephen Mummo stated that Joe Blair was "My guy",  Richard Berry Heavner said " Stephen Mummo your guy cheated on his wife with a co-worker for 7 years. He should be fired for what he did."  Responding to a Facebook post commending 911 Supervisor Joe Blair dated November 9, 2020, Mr. Heavner again replied " Such a great guy. Ask him about his 7 year affair when he was cheating on his wife with a coworker." Then there was another March 16, 2023 post on the  911 Facebook page by Richard Berry Heavener who, in not recommending Delaware County Emergency Services 911, explicitly stated that trainers use a position of power to have affairs behind their wives' backs with female co-workers . "The county should be very careful on who they hire because this could cause a sexual harassment lawsuit or worse." Upon information and belief, Mr. Berry's wife worked as a 911 call-taker and had had exposure to males abusing their positions. The question arises as why Defendants did not investigate this post on the Department's own 911 Facebook page/site and address the situation.

71.  Moreover, upon investigation, information, and belief, certain DES supervisory

personnel, including but not limited to then Deputy Director Edward Beebe, were specifically
witness to and well aware of Boyce's inappropriate customs and practices when it came to
women, even assisting Boyce when it came to delivering/returning Plaintiff to Boyce.

72.   Specifically, certain DES supervisory personnel, including but not limited to then
Deputy Director Edward Beebe and Office Manager Regina Rodia were specifically witness to
and well aware of Boyce's inappropriate customs and practices when it came to certain women
and deliberately chose not to report the infractions as required. For instance, DES employee
Brigid Payne, responsible for the uniform budget was in Boyce's office in mid-September, 2022,
along with Beebe and Rodia. Boyce had previously required Ms. Payne to order tank tops for
female employees. Now, Boyce asked Ms. Payne to try one of them on, which she did , albeit
under a cardigan. Ms. Payne told Boyce that these female tank tops were totally inappropriate
for work wear, adding that if someone were to bend down, her chest would be exposed. Boyce's
response was "Oh really ! Let me see. Bend over." Ms. Payne refused, informing him that it
would be inappropriate. Reportedly, Mr. Beebe and Ms. Rodia witnessed Boyce's inappropriate
behavior. Moreover, upon further investigation, Ms. Rodia told Boyce that what he was then
asking and doing were not appropriate. However, apparently, neither Beebe nor Rodia reported
the matter to HR.

73.   With respect to the tank top incident described above, Ms. Payne, complained about
this to supervisory personnel Chief of Communications Anthony Mignogna.

74.   Also, in a separate meeting in late September, 2022, Ms. Payne spoke with both Ms.
Samantha Cox, her supervisor and Mr. Mignogna disclosing preliminarily what happened in a
separate incident with Boyce after the tank-top incident where Ms. Payne, told them that if she
were to give further details, that they would be required to report the incident. They both

acknowledged that they understood and told her to proceed. She advised them of inappropriate inquiries by Boyce about her sexual habits, asking if she had ever had sex with women and accused her of doing so with another employee. Notwithstanding Ms. Payne's relating this information, nothing further took place. Within a month of Ms. Payne complaint to Mignogna and Cox, on October 28, 2022, Mr. Mignogna was promoted.

75. Upon investigation, information and belief, supervisory employee and Office Manager Regina Rodia was described by Boyce as his "right hand." She was Boyce's first promotion during his tenure. It is believed that for years, she has known about Boyce's exploits, referring along with others to employee Maille Bonsall as Boyce's "Pony" and to Ms. Bonsall and employee Ms. Sara Senkow (now Schieler) as his "girlfriends." Upon information and belief , Rodia was also well of office sexual exploits of others in the office, telling DES employee Ms. Paula Richards in July 2022 not to use the bathroom across from Boyce's office as "that's where nasty things happen" and not to use another bathroom with a shower as it was used as a sex room. Ms. Rodia has repeatedly referred to Plaintiff and Sara Senkow (Schieler) as Boyce's "girlfriends". Ms. Rodia has also recently acknowledged to Plaintiff that she knew that Plaintiff was unsafe with Boyce. Moreover, now she admits that she should have warned Plaintiff about Boyce. At the same time it is believed that she never reported to the Department of Personnel or HR what she had witnessed or otherwise had knowledge of .

77. In addition to Mr. Beebe's being a direct witness to Mr. Boyce's activities in the tank-top meeting, at Boyce's request, it was Mr. Beebe whom Boyce would repeatedly send to find Plaintiff, who repeatedly tried to physically distance herself from Boyce's advances. It was Beebe who would direct her to return. Moreover, in early 2024 Beebe was present along with Boyce and Sara Senkow (now Schieler) where they were sizing up a storage area for

repurposing when Boyce reportedly said, " I'd love to have a black light to see what was going on back here..." insinuating that bodily fluids would be found. Boyce later admitted to Beebe that he should not have made the black light comment. Apparently Beebe never told HR about this incident either.

78. What is more, upon information and belief Beebe knew of Boyce's propositioning a restaurant waitress for a threesome with Plaintiff. Beebe learned about this when he and his girlfriend went to lunch and the waitress told him what Boyce had requested. Beebe told others about this, including Plaintiff, but did not appear to tell HR.

79. Moreover, Mr. Beebe, Mr. Mignogna, and Ms. Rodia constantly saw Boyce come into Plaintiff's office and shut the door behind him, despite Boyce's stated policy to shut doors only when "personnel matters " were being discussed. Plaintiff has had nothing to do with personnel matters. They clearly saw him stalk her. There were instances where Boyce would ask Plaintiff to go somewhere with him alone in his car and she refused. Plaintiff reported these requests to Ms. Rodia who told her that she objected to Boyce about his behavior. However, upon information and belief, there is no evidence that Mr. Beebe, Mr. Mignogna, or Ms. Rodia exercised their affirmative obligations as County employees to complain to HR/Personnel about Mr. Boyce.

80. Upon investigation, information and belief, Council Defendants, rather than exhibiting minimal oversight or investigation, rubber stamped Boyce's personnel requests. Apparently, the Council Defendants never bothered to ask why Boyce demonstrated a record of disproportionately favoring his personally-chosen young and inexperienced females to the financial detriment of other DES functions such as the dispatch room. Any review or investigation would have shown what was transpiring. However, despite the rampant rumors and

reference to Plaintiff as Boyce's girlfriend, in DES and in the Courthouse generally, from County Council on down, the named Defendants have incredibly chosen to maintain that they had no idea of Boyce's inappropriate abuse.

81.  Council's public stance of "see no evil, hear no evil" ignores the fact that Council Defendants had  affirmative responsibilities to monitor their employees  to comply with the requisites of federal, state and local law, including the County's own personnel policies.

82.  The County Personnel Handbook specifically requires reporting of misconduct, which failed to take place with respect to Boyce.  Upon investigation, information and belief, DES employees, Plaintiff included, have been afraid to do so, fearful for their jobs and retaliation.  However, had appropriate officers, such as County Solicitor Jonathan Lichtenstein, County Executive Director Barbara O'Malley,  Personnel Head Heck, Acting DES Director Beebe and  other supervisory personnel at DES been doing their jobs, Boyce would have been removed well before he had the chance to exploit Plaintiff.

83.  Boyce himself referred to his exploits as being protected by the powers that be, enjoying a situation where he was able to "hide in plain sight,", doubtless as a result of his prominence and political connections with Delaware County elected and party officials, including all named Defendants.

84.  Despite Council's being  formally put on notice of Boyce's preference for young female employees (specifically naming Plaintiff as well as others) as result of Joanne Fisher's filing of an EEOC Charge in late January, 2024, listing Defendant Lichtenstein as the contact party for the County, no action was taken to investigate Boyce.  Other EEOC charges involving Boyce's activities have since been provided to Defendant Lichtenstein,  who has been listed as the County's contact party.

27

85. Frustrated by Defendants' total failure to make so much as inquiry as to Ms. Kahler's abrupt disappearance from work, Ms. Kahler (via counsel) on or about April 1, 2024 approached the DELCO District Attorney's office, imploring DA Stollsteimer to investigate and prosecute Boyce on behalf of Ms. Kahler and other women, who have been subjected to Boyce's abuse. Plaintiff believes that had Ms., Kahler not gone to the District Attorney, nothing would have been done by the Defendants concerning Boyce, who would continue to remain in his position to this day.

86. The DA's office performed an investigation, which included conducting interviews of the Plaintiff. It then referred the matter to the Pennsylvania Attorney General , to avoid a perceived conflict of interest, for further investigation and possible origination of criminal charges other than just those involving Boyce's involvement with Ms. Kahler.

87. As opposed to relying on information already provided to Council's solicitor, Jonathan Lichtenstein, Esquire, it was only in reaction to news of the DA's investigation, that Council placed Boyce on administrative leave, which was not until April 25, 2024. Further, it was not until May 10, 2024 that County Council voted to terminate his employment, coming only days before the Pennsylvania Attorney General filed a May 16, 2024 criminal complaint against Mr. Boyce for his actions against Ms. Kahler. All the while, Council President Monica Taylor, someone whom Boyce reportedly referred to as being "in his pocket", professed ignorance on her own behalf and on behalf of Council.

88. The Criminal Complaint filed against Boyce with respect to Ms. Kahler charges Boyce with violations consisting of:

    -18 Section 3126 sections A1:  Indecent Assault w/o the Consent of the other

    -18 Section 2701 sections A3: Simple Assault

28

-18 Section 2709 sections A1 : Harassment – Subject Other to Physical Contact. On September 11, 2024 a Magistrate held a preliminary hearing and bound him over for a Delaware County Court of Common Pleas criminal trial on all charges.

89.   Upon information and belief, Plaintiff understands that the investigation by the Attorney General's office, predicated on the initial investigation by the District Attorney, has been ongoing with respect to other possible victims.

90.   An additional criminal complaint was filed by the Attorney General against Boyce on August 13, 2024 with respect to another alleged victim, DES employee Sara Senkow (Schieler).  During the preliminary criminal hearing conducted on September 18, 2024, she testified of her disgustingly inappropriate experience with Boyce going back to 2018, where Boyce showed her personal photos of his private parts maintained on his phone. She reported this to her then boss, Anthony Mignogna, and no action was taken against Boyce.  Allegedly, this was followed by a November, 2023 incident where Boyce lifted her dress up to her thong undergarment, declaring that her tattoos were intriguing. She further testified that in January of 2024, Boyce put his hand on her butt, followed by a conversation later that month where Boyce described various sexual positions that he would like to engage in with her. She reported this latest incident to her supervisor, Danielle Koerner, Chief of Special Operations. Upon information and belief,  Ms. Koerner dismissed her report and no action was taken against Boyce.  At the conclusion of the September 18, 2024 preliminary hearing,  Mr. Boyce was bound over for a  Delaware County Court of Common Pleas criminal trial on all charges.

91.   Ms. Senkow's (Schieler) testimony demonstrates more in the way of complaints to Delaware County supervisory personnel going all the way back to 2018, without action taken

against Boyce. Given those complaints, Boyce should have been removed well before Plaintiff's appointment as his Executive Assistant in March of 2019.

92.   It was not until May 29, 2024 that  Executive Director O'Malley announced, in an email to DES employees, that " the County does not tolerate harassment, discrimination, retaliation, abuse of power, or other violations of the County code or policies." Clearly, time and events detailed herein have shown that the County and Defendants named have long tolerated harassment, discrimination, retaliation, abuse of power and other violations of the County Code or policies. Moreover, Defendant O'Malley's words are also indicative of an intended whitewash, given her clear words in announcing the retention of an outside law firm "in an effort to assure that there are no violations of the code, policy or any other misconduct."  By then, only thanks to Ms. Kahler's advocacy, the horse, and Mr. Boyce, were well out of the barn.

93.   Upon investigation, information and belief, the questions posed by this "outside law firm" have been geared to establish ignorance on the part of County Council. The clear implication  of this taxpayer-funded exercise is to exonerate County Council, as well as those on down, from any responsibility whatsoever when it comes to oversight of County employee, Tim Boyce. Upon information and belief, at least one interviewee told the law firm that everyone at the County knew of Boyce's behavior.

94.   Regardless of the County Council's denial of knowledge, the County Code at Section 6-18 makes the Personnel Department affirmatively "responsible for coordinating and overseeing the  hiring, training, assignment, reassignment, rotation, performance evaluation and discharge of all personnel in the merit service and in unclassified positions." Further the Department is responsible for the establishment of duties and qualifications for all positions in consultation with the heads of County departments and offices."  Instead of investigation, oversight, consultation and evaluation, Plaintiff believes that Boyce was given carte blanche to

30

do whatever he chose to do.

95.   During Plaintiff's tenure, Delaware County had in force a Personnel Handbook setting forth affirmative responsibilities of employees. Under the heading "Employment Policies" is the following statement: "The County of Delaware is committed to a policy of equal employment for all individuals. According to Title VI and Title VII of the Civil Rights Act of 1964 and other Federal, State, and Local Laws, the County of Delaware is an equal employment opportunity and prohibits discrimination on the basis of race, color, religion, disability, ancestry or national origin, gender, age, and military service. All personnel actions and decisions… is predicated solely on ability and the basis of valid job-related requirements." Clearly the Defendants have violated this professed standard in multiple ways and at multiple times.

96.   Further, under the Handbook  section "Rules of Conduct" is a paragraph headed "Harassment & All Forms of Discrimination" stating in pertinent part that " Harassment of one employee by another will not be tolerated. Actions such as sexual threats, inappropriate comments, or physical contact of any nature are examples of harassment and will be considered justifiable grounds for discipline up to and including discharge." Further,  it states that a "Department Director or Supervisor who receives information regarding a complaint must act on that complaint."  Defendants' "Head in the Sand" approach doesn't absolve them of responsibility of taking the required steps, nor does it absolve the supervisory personnel named herein who witnessed and/or were told about infractions by Boyce.

97.   As detailed herein, Plaintiff's experience and the experience of those before and after her have hardly been indicative of any commitment by the County to applicable law or policy. Had there been any commitment, Boyce would have been gone long before Plaintiff's employment as his Executive Assistant.

31

98.   During Plaintiff's tenure, the DELCO website touted Mr. Boyce, stating that "As Director, Mr. Boyce leads a staff of 125 dedicated public servants that [sp] operate the County's 911 communications center, coordinate emergency management plans and provide a wide variety of public services to augment and support first responders and the public."

99.   Incredibly, despite what has been pointed out hereinbefore, and what must have been known to all Defendants named, since Boyce's departure, Mr. Beebe, of all people, has been allowed by Council to succeed him with a formal announcement on September 5, 2024  by County Executive Director Barbara O'Malley to DES employees that:

> It is my pleasure that County Council has approved the appointment of Ed Beebe as Interim Director of the Department of Emergency Services effective September 9. As you know, we conducted many interviews through an external firm, speaking with many employees at DES. Based on the results of those conversations and his experience, we have complete confidence in the appointment of Ed Beebe as Interim Director
>
> We greatly appreciate the patience displayed by the entire team as we took time to ensure we have made the best decision for the department. Ed Beebe has shown care and commitment to the department and leadership during this challenging time. Ed Beebe is empowered to make decisions and to manage the department in his role as interim director. We also value his experience to work with executive staff here in the County to address the concerns identified by DES employees.
>
> …
>
> At this point, we do not have any plans to post for a replacement director. Recognizing the unique situation, we are in and the stability and familiarity that Ed Beebe brings to this role, we will maintain an Interim Director for a more lengthy time period …
>
> We look forward to Ed Beebe's tenure as leader of the department We appreciate all the work you do to keep the County safe.

100.   With this announcement,  Ed Beebe promptly promoted Anthony Mignogna to be his Deputy.

101.    Contrary to Ms. O'Malley's assertion, upon information and belief, Edward Beebe and Anthony Mignogna never showed leadership or commitment to act in a way that kept Plaintiff or other females safe, let alone did they comply with County Code reporting requirements. For years before Plaintiff's experience with Boyce, others, including Office Manager Rodia, Deputy Mignogna,  Ms. Samantha Cox, and Chief of Special Operations Danielle Koerner, had information and were in a position where they could have prevented Boyce from sexually harassing and assaulting Plaintiff altogether.

102.    As per the website quoted in paragraph 98 hereof, a  "public servant" is what Plaintiff set out to be when she joined the DES; not a sex toy or a vulnerable piece of meat.

103.    Defendants have allowed DES to exemplify a place of blatant sexism and sexual harassment rather than to exemplify a place of public service.

104.    Instead of Defendants' providing Plaintiff with a safe working environment where she could progress as a public servant based on her ability, Defendants provided Boyce with the opportunity to maintain unwilling "servants" for his personal sexual desires.

105.    Plaintiff's own shockingly devastating experience with Mr. Boyce, consisting of his unrelenting male, sex-driven physical and mental oppression of her and the attendant existence of a hostile environment,  promise to continue to traumatize her for the rest of her life. This is directly due to the callous and illegal inaction of Defendants.

106.    Had County Council,  its members, together with the rest of the Defendants named, and undoubtedly others unnamed, exercised their affirmative responsibilities to provide a lawful and safe workplace at DES, Boyce would have been long gone from County employment, depriving him of the opportunity to sexually and emotionally abuse Plaintiff. Their years of

33

calculated inaction, going at least back to 2018, render these Defendants liable.

107.  As stated hereinbefore in paragraph 58, Boyce improperly called her after his suspension. Then even after criminal proceedings were initiated against him, unabashed, he approached her trying to speak to her at his first criminal preliminary hearing.  Plaintiff remains fearful of Boyce.

108.  Had Defendants exercised their affirmative responsibilities to provide a safe and lawful workplace at DES, Boyce would have been long gone from County employment, depriving him of the opportunity of abusing Plaintiff.

109.  What is more, even with Boyce gone,  Plaintiff has since unnecessarily and Unjustifiably experienced retaliation by current Acting Director Edward Beebe and others. On Monday, May 14, 2024, Beebe met with Plaintiff and advised her that, notwithstanding her title as Deputy 911 Coordinator, she would no longer be performing the duties associated with 911 coordination and that Anthony Mignogna would be handling them. This was the result of a meeting with Defendants O'Malley, Beebe and Mignogna. This is but one of several instances/attempts to remove certain of Plaintiff's responsibilities as well as change her hours. She has also been isolated and shunned. One DES employee has openly stated that anyone making claims or lawsuits  against the County, such as Plaintiff, should not be allowed to be at work.  What is more. Beebe and HR Generalist Dana Howard retaliated and  harassed Plaintiff when it came to her having been subpoenaed by Boyce to his September 11, 2024 criminal preliminary hearing. They went so far as to tell her to ignore the subpoena and/or reschedule Boyce's criminal hearing. As of October 11, 2024, Defendant Rodia changed Plaintiff's "user permissions" with respect to the DES scheduling application which had been the same for the last five and one-half years. Plaintiff used to be able to adjust her schedule depending upon

whether or not she had to report to Court . Plaintiff cannot do this now for herself or for others as

she was able to do in the past.   Also, Plaintiff has been denied access to employee reports that

she needed to compile DES's annual PEMA report. Finally, Plaintiff has been excluded from

various budget and other meetings. At the present time, Plaintiff has to endure on a daily basis

hostility and isolation as a result of Defendants determination to have her quit. Beebe does not

speak to her unless she has to go to him with work-related matters. Ms. Rodia, whose office is

next to Plaintiff's, does not speak to her. She spends a good part of the day slamming her door

and gossiping with others undoubtedly about Plaintiff.  Nor does Ms. Rodia's son, who just

happens to be the office receptionist, speak to Plaintiff. Such is also the case with HR

Representative  Ms. Dana  Howard whose misbehavior  with respect to a subpoena issued by

Boyce to Plaintiff occasioned a letter by Plaintiff's counsel to Defendant County Solicitor

Lichtenstein.  Upon information and belief this retaliation has all been occasioned as a result of

Plaintiff's standing up for herself and filing an EEOC Charge. This retaliation promises to

continue  given the fact that Beebe and others have been loyal allies of Boyce's.


## COUNT I

### VIOLATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION and THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. SEC. 1983

**Bonsall  v. County of Delaware & All Defendants in Their Official & Individual  Capacities**

110.  Plaintiff restates and reallege paragraphs 1 through 109  as though set forth here in

full.

111.   A Plaintiff asserting a civil rights violation under Section 1983 must establish (1) the

deprivation of a right secured by the United States Constitution or federal law; and (2) that the

35

alleged violation was acting under color of state law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)  Here liability rests with the governmental unit.

112.    Defendant County, its officials, and supervisory personnel have discriminated against the Plaintiff by depriving her of her rights, privileges and immunities secured by the Constitution or laws of the United States as applied to the States pursuant to the Fourteenth Amendment. The Fourth Amendment to the U.S. Constitution as extended by the Fourteenth Amendment provides a right to be free from unreasonable searches and seizures in conjunction with or respect to governmental activity. Specifically, the Due Process and Equal Protection clauses of the Fourteenth Amendment recognize this Plaintiff's right to be free from sexual misconduct and/or abuse at the hands of a County employee.  Specifically, the Third Circuit has recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008)

113.    Furthermore, 14th Amendment notions of "substantive due process" and a "right to privacy" further protect Plaintiff from what she has experienced. "To demonstrate that her substantive due process rights were violated [Plaintiff] must establish that "the government's deprivation of that protected interests shocks the conscience." *Kane v. Berger*, 902 F.3d 185, 192 (3d Cir. 2018) (citing *Chainey v. Street*, 523 F. 3d 200, 219 (3d Cir. 2008)   What Plaintiff has experienced certainly fulfills the "shocking to the conscience" standard in terms of what she endured at the hands of Boyce and the deliberate indifference of County officials to Boyce's previous behavior. Case law which found official conduct and officials' responses thereto to have shocked the conscience involve serious sexual battery and assault such as that experienced by Plaintiff.

36

114.    Plaintiff must, and has, satisfied the "state-created danger" theory of liability, requiring Plaintiff to plead four elements. First, there must be foreseeable and fairly direct harm. Second , there must be action marked by "a degree of culpability that shocks the conscience". Third, there must be a relationship with the governmental unit that makes the plaintiff a foreseeable victim, rather than simply a member of the public, in general. Fourth, there must be an affirmative use of governmental authority in a way that created the danger. *Johnson v. City of Phila.*, 975 F.3d 394, 400 (3d Cir. 2020) (citing *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018)

115.    Boyce's conduct, as a state actor utilizing his official position and capacity, as set forth hereinabove, amounted to an invasion of Plaintiff's constitutional right to personal security from sexual exploitation,  violating her constitutional right to bodily integrity.

116.    Having affirmative responsibilities as herein referenced, Defendant County and its officials, named Defendants, instead provided an atmosphere enabling Boyce to violate the rights of Plaintiff and others.

117.    Plaintiff avers that Defendant County and its officials, for years, has had unconstitutional customs and policies of deliberately ignoring and failing to investigate Boyce's misconduct against Plaintiff and others, failing to adequately supervise and train County employees with respect to maintaining, preserving and protecting Plaintiff and other women from violations of their right to personal security and bodily integrity.

118.    Defendant County and those named in their official and individual capacities, along with others, have acted intentionally, deliberately, willfully, and have conducted themselves in callous and  deliberate disregard of  Plaintiff's rights enabling Boyce to violate those rights.

119.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer embarrassment, humiliation, financial harm, emotional and psychological harm, and pain and suffering, some or all of which may be permanent.

120.     As a direct and proximate result, Plaintiff has incurred attorneys' fees and other costs.

121.     By reason of Defendants' action and inaction amounting to violation of Section 1983 protections, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and specifically against Defendant County of Delaware and the named Defendants acting in their official and individual capacities and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages given that Defendants were reckless or callously indifferent, together with reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT II

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000 *et seq*

### SEX DISCRIMINATION & MAINTENANCE OF A HOSTILE WORK ENVIRONMENT

#### Bonsall v. The County of Delaware, Pa

122.     Plaintiff restates and realleges paragraphs 1 through 121 as though fully set forth herein.

123.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, et seq. as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

124.     Discrimination on the basis of sex that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as sex discrimination. In order to establish a hostile work environment, five factual elements must be established: (1) that the employee suffered intentional discrimination because of his or her protected characteristic; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person in the same position as the employee; and (5) that respondeat superior liability exists.

125.     In the totality of circumstances described in the facts set forth hereinbefore, when it comes to Plaintiff's physical mistreatment on account of her sex, the foregoing five elements are established.

126.     In addition, under Title VII, a hostile environment exists when the workplace "is permeated with discriminatory, intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of  the victim's employment and create an abusive working environment." In addition to Boyce's explicit sexual advances, a work environment that involves gender-based animosity, including sexist comments, remarks that intimidate, ridicule and  maliciously demean the status of women can create an environment that is considered as hostile as one containing unwanted sexual advances.

127.     Plaintiff's work environment has consisted of both sexually harassing behavior as well as gender-based animosity, including sexist comments. By requiring Plaintiff to work in a sex-based hostile environment consisting of both verbal and physical abuse by Tim Boyce, Defendant County has violated Plaintiff's right to work in a non-abusive working environment.

128.     Defendant is also liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

129.     Defendant is liable for the acts of management, Plaintiff's supervisors, and

others, because they knew of the existence of a discriminatory and a hostile work environment but allowed the illegal acts and practices to continue and took no corrective action.

130.    Defendant is liable for the acts alleged herein because its governing body, appointed directors, supervisors, managers and employees established the culture which encouraged sex discrimination, harassment and retaliation against women in the Department of Emergency Services.

131.    Based upon the foregoing facts, Defendant has discriminated against Plaintiff on the basis of her sex and has deprived her of her rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq. as amended.

132.    Defendant's conduct has been intentional, deliberate and willful, with malice or callous and reckless indifference to Plaintiff's rights protected by the United States, as well as the laws of the Commonwealth of Pennsylvania and the County Code, all conducted in callous disregard of the rights of the Plaintiff.

133.    Defendant's policies and/or practices have produced a disparate impact against the named Plaintiff with respect to the terms and conditions of employment.

134.    By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant County of Delaware and request an award of relief including but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs and other relief as permitted under the law and as this Court deems just and proper.

## COUNT III

### VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT SEX DISCRIMINATION IN EMPLOYMENT, CREATING A HOSTILE WORK ENVIRONMENT

#### Bonsall v. County of Delaware

135.  Plaintiff restates and realleges paragraphs 1 through 134 as though set forth here in full.

136.  This claim arises under the Pennsylvania Human Relations Act ("PHRA"). The Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.*, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment.

137.  Plaintiff is in a protected class because of her sex.

138.  Based upon the foregoing facts, Defendant has discriminated against Plaintiff on the basis of her sex and has deprived her of her rights in violation of the Pennsylvania Human Relations Act, 43 P.S. § 955 *et. Seq.*

139.  The effect of the aforementioned practices has been to deprive Plaintiff of equal employment opportunities and adversely affect her status as an employee because of their sex and age.

140.  By reason of Defendant's discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant County of Delaware and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

41

## COUNT IV

### NEGLIGENCE (INCLUDING NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

#### Bonsall  v. Delaware County and All Defendants

141.    Plaintiff restates and realleges paragraphs 1 through 140 as though set forth here in full.

142.    At all relevant times these Defendants knew or should have known that Boyce had a reputation for inappropriate behavior and/or conduct with Plaintiff and other females, years before her. Aside from their affirmative obligations cited hereinbefore, upon information, investigation, and belief, this knowledge ran the gamut from rumor and innuendo, to specific observation of Boyce's infractions. Notwithstanding, these Defendants  took no action to protect Plaintiff, including acting pursuant to their mandated responsibilities to investigate, take personnel action and/or intervening to prevent what had  transpired with Plaintiff  and others before her.

143.    At all relevant times, Defendants had a duty to recognize inappropriate conduct by Boyce with Plaintiff and other females and to protect them.

144.    At all relevant times, Defendant County and top management thereof failed to properly train County employees to recognize and  prevent inappropriate relations and/or conduct between County employees in the workplace.

145.    At all relevant times, when it came to Boyce's interaction with female employees, the Defendants knew or should have known that Boyce's inappropriate behavior were warning signs that female employees, including Plaintiff, were in danger while they were in the care, custody and control of Defendant County.

146.    At all relevant times, Defendant County, County Council Members, County Solicitor, and those in its Personnel Department, all named as Defendants herein failed to conduct anything in the way of routine checks or investigations with respect to DES.

147.    Not only did the above-named Defendants fail to take any corrective affirmative action against Boyce, as was their duty to Plaintiff and other women, they allowed Boyce to remain employed with access to the workplace premises and allowed him to have the ability to engage in inappropriate conduct towards females.

148.    In allowing Boyce to act as he had with respect to Plaintiff, all Defendants are responsible for her suffering severe emotional distress.

149.    All Defendants' actions and/or omissions as set forth in the foregoing paragraphs do constitute such negligent, wanton, willful and reckless conduct such that Plaintiff is entitled to the relief requested for her losses and damages as a result of their negligence.

150.    By reason of the foregoing, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant County of Delaware and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT V

## NEGLIGENT SUPERVISION OF TIMOTHY BOYCE

**Bonsall v. Delaware County, County Council, Councilmembers  Monica Taylor, Elaine Paul Schaefer, Kevin M. Madden, Christine A. Reuther, Richard R. Womack, Jonathan Lichtenstein, Christine Keck, and Barbara O'Malley**

151.    Plaintiff restates and realleges paragraphs 1 through 150 as though set forth here in full.

152.    Plaintiff brings this Count of Negligent Supervision against those individuals above-named in both their official and individual capacities.

153.    The above-named Defendants, including but not limited to the County's elected leadership were  negligent in the supervision of Timothy Boyce, thereby allowing him to engage in the conduct heretofore alleged.

154.    It has long been the law in Pennsylvania that an employer may be liable in negligence if it knew or should have known that an employee, such as Boyce, was dangerous, careless, or incompetent and such employment might create a situation where the employee's conduct would harm a third person, in this case Plaintiff.

155.    The named Defendants had an affirmative duty to provide reasonable supervision of its employees and agents, specifically Timothy Boyce.

156.    Given the innuendo that circulated and what has been otherwise described hereinbefore, it was reasonably foreseeable that the named Defendants should have monitored and investigated Boyce such that he would not have been able to sexually assault Plaintiff.

157.    The named Defendants knew or reasonably should have known that Boyce was conducting himself in an inappropriate sexual manner with females, but took no

action to investigate, supervise, or monitor the same.

158.    Instead, the named Defendants made the conscious decision to continue to employ Boyce, until after  Ms. Kahler went to the DELCO District Attorney.

159.    To willfully allow Boyce to be in a position placing employees safety, security, privacy and bodily integrity shocks the conscience and at the very least was reckless in nature.

160.    Moreover, the named Defendants failed to formulate, adopt, implement and/or use an appropriate monitoring system to ensure the protection of Plaintiff and/or others similarly situated when they knew or should have known that Boyce had a reputation and/or propensity for acting inappropriately with female employees. The negligence of the named Defendants was the proximate cause of Plaintiff's actual loss and injury.

161.    The named Defendants' breach of their duties to Plaintiff  to provide reasonable supervision of Boyce was outrageous and committed willfully or with reckless indifference to Plaintiff  and other women.

162.    All of the named Defendants' actions and/or omissions as set forth in the foregoing paragraphs do constitute such negligent, wanton, willful and reckless conduct such that Plaintiff is entitled to the relief requested for her losses and damages as a result of their negligent supervision of Boyce.

WHEREFORE, Plaintiff demands judgment in her favor and against the named Defendants and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable

attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

### COUNT VI

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*Bonsall   vs. Edward Beebe and Delaware County*

163.   Plaintiff restates and realleges paragraphs 1 through 162 as though set forth here in full.

164.   Defendant County, through Edward Beebe in both his official capacity and individually,  have both inflicted severe emotional distress upon Plaintiff.  This tort has been recognized as something not created by contract, but rather something independent of contract, instead imposed by the law of torts *Dobson v. Milton Hershey School*, 336 F. Supp. 3d  428,439 (M.D. Pa. 2018)  *Remlinger v. Leb. Cnty*, Civil No. 1:18-cv-00984, page 12, (M.D. Pa. Jun. 11, 2020), (Citing Dobson)

165.   Beebe repeatedly tracked down Plaintiff, who was trying to hide from and otherwise avoid Boyce, delivering Plaintiff to him, in effect, acting as a procurer for Boyce when Beebe clearly knew of Boyce's tendencies, having observed some of them firsthand without reporting him.

166.   By their actions when it came to their treatment of Plaintiff, all as described hereinbefore: (1) these Defendants have engaged in extreme and outrageous conduct, (2) which conduct caused Plaintiff to experience severe emotional distress, (3) and these Defendants acted intending to cause such distress or acted recklessly with knowledge that the same was substantially certain to occur.

167.    Emotional distress includes all of Plaintiff's unpleasant mental reactions, including but not limited to fright, horror, grief, shame, humiliation embarrassment , anger, chagrin , disappointment, worry and extreme anxiety.

168.    In accord with this Court's ruling in *Corbett v. Morganstern*, 934 F. Supp. 680, 684-685 (E.D. Pa. 1996), Plaintiff's symptoms, which include " 'symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and … ongoing mental and emotional harm' sufficiently state physical  harm or injury to sustain causes of action for infliction of emotional distress."

169. Especially given the circumstances,  the extreme and outrageous conduct by these Defendants goes beyond all possible bounds of decency and has to be regarded as atrocious and utterly intolerable by a reasonable person in a civilized society.

170.    As a direct and proximate result of the extreme and outrageous conduct of these Defendants as set forth above, Plaintiff  has suffered severe emotional distress including but not limited to humiliation, mental anguish, frustration, stress, loss of self-esteem and other actual consequential and non-pecuniary damages.

171.    The extreme and outrageous conduct of these Defendants, as set forth above, which was committed with a reckless indifference to the rights of Plaintiff, warrant the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against the named Defendants and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## JURY DEMAND

The Plaintiff demands trial by jury of all issues triable of right to a jury.

## CERTIFICATION

I hereby certify that to the best of my knowledge and belief the above matter in controversy is the subject of any other action pending in this court; namely the case of Kahler vs. Delaware County, et al. filed at 2:24-cv-05219-MRP. It is Plaintiff's position that this case be consolidated with Kahler for discovery purposes.

Respectfully Submitted,

/s/ Mark D. Schwartz

_____
Mark D. Schwartz, Esquire
P.O. Box 330
Bryn Mawr, PA  19010-0330
Telephone & Fax: 610 525-5534
Email: MarkSchwartz6814@gmail.com
Pa. I.D. #30527

Date: November 1, 2024                    Counsel for Plaintiff, Maille Russel Bonsall

## **VERIFICATION**

I, Maille Russel Bonsall,  do hereby certify that I am the Plaintiff in the within action, and that the facts continued in the foregoing Complaint  are true and correct to the best of my knowledge, information and belief.  I do further understand that these statements are made subject to the penalties of 18 Pa. C.S. Section 4904, relating to unsworn falsification to authorities.

Dated:  11/1/2024

Maille Russel Bonsall
Maille Russel Bonsall